PROFESSIONAL REALTY CORPORATION, Plaintiff and Appellee, v. SECRETARY OF THE TREASURY, Defendant and Appellant.

No. R-63-144.       Decided April 5, 1965.

*J. B. Fernández Badillo,* Solicitor General, *Rodolfo Cruz Contreras,* Deputy Solicitor General, and *J. F. Rodríguez Rivera,* Assistant Solicitor General, for appellant. *Celestino Iriarte, F. Fernández Cuyar,* and *Héctor González Blanes* for appellee.

Division composed of Mr. Acting Chief Justice Pérez Pimentel, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

The Secretary of the Treasury of Puerto Rico, in order to levy property taxes for the fiscal year 1951–52, assessed the taxpayer-corporation's real property—a lot located at 308 De Diego Ave., Santurce, together with the building and equipment thereon—at $694,000. When, after the introduction of a more scientific method, the first revision was carried out, the assessment was increased for the taxable year 1958–59 to $1,208,530, which is almost twice the original assessment. Disagreeing with this administrative determination, the taxpayer paid only part of the tax and within the statutory term it filed a complaint before the Superior Court contending that the alteration in value "according to the tax assessment rules," resulted in a greater assessment than the pertinent one; that the determined value is greater than the market value of the real property; and that in any event, for tax purposes no assessment in excess of $800,000 should be considered.

After the hearing on the merits, which was practically reduced to a debate among the appraisers, the trial court rendered judgment, which is transcribed below, finding $1,035,348.75 to be the assessment value for tax purposes, which amount represents a reduction of $173,181.25 from the assessment determined by the Secretary and an increase of $235,348.75 from the assessment alleged by the taxpayer:

## "Judgment

"The Secretary of the Treasury of Puerto Rico assessed for the year 1951–52 a lot located at 308 De Diego Ave., Santurce, and the building and equipment thereon owned by the taxpayer and known as the 'Professional Building' in the amount of $694,000, which represented 76% of its value for property tax purposes.

"For the taxable year 1958–59 the same property was assessed at $1,208,530, which represented 90% of the value of the property for property tax purposes.

"The 1958–59 assessment took into consideration the 25% increase in the cost of materials and labor and the increase in assessment from 76% to 90% of the value.

"Increasing the 1951–52 assessment from 76% to 100% the property would have a $920,310 value on said year. Increasing such value, for the year 1958–59, by 25% would result in $1,150,387.50. The 90% assessment of such amount for that year is $1,035,348.75, which we determine to be the assessment for 1958–59 for tax purposes.

"The 1951–52 assessment was based on estimates, since this was a special structure. The 1958–59 assessment was based on the original estimates plus the increase in construction costs. The assessment made on the estimates considers the lot's value, blueprint expenses, number of square feet constructed, steel, doors, windows, kind of materials used in the construction and cost by items, that is, how much it would cost to build on the basis of the blueprints.

"The $1,208,530 (90%) assessment for 1958–59, if increased to 100% would amount to $1,342,811. The cost of constructing the building in 1949 amounted to $1,388,000.

"In making consistent the Secretary's position, and admitting as correct the 1951–52 original assessment ($694,000) we find, considering the change in rate from 76% to 90% and the increase of 25% in the cost of materials and labor, an assessment of $1,035,348.75.

"Real property shall be assessed at its actual and effective value by utilizing any of the methods and factors recognized with respect to property valuation and assessment so that the assessment for each of the different types of property may be uniform. 13 L.P.R.A. § 432.

"The method used by the Secretary for 1951–52 with an increase for 1958–59 is, in our judgment, the fair and reasonable method. Any other method would be speculative and subject to very personal criteria.

"The complaint is admitted and, for the year 1958–59, the amount of $1,035,348.75 is found to be the assessed value of the lot and the building and equipment thereon, which constitutes the property involved. in this complaint. The Secretary shall issue new tax receipts in the above amount. The sum of $101,067 applies to the lot, the rest to the structure."

The Secretary of the Treasury filed this appeal for review of the above judgment. The Secretary points out that the trial court erred (1) in considering as the base for the assessed value an assessment made in prior years and which, according to evidence, was incorrect; (2) in refusing to follow the assessment method used by the Secretary of the Treasury; and (3) in refusing to admit pertinent evidence and ignoring other evidence which tends to weaken the method selected by the judge to make his final determination of value.

■ ■ The basic principle of the scientific assessment method is clearly stated in the first paragraph of § 3 of Act No. 117 of May 9, 1947, 13 L.P.R.A. § 432, in the following language: "The Secretary of the Treasury shall classify and assess all real property at its actual and effective value by utilizing *any* of the methods and factors recognized with respect to property valuation and assessment, so that the assessments *for each of the different types of property may be uniform.*" Briefly, and to avoid any inconsistency resulting from different methods of assessment of properties with similar characteristics, uniformity was established as a rule with a complete abstraction from the individuality of things, except in rare cases. It is not our intention, as we pointed out in *People* v. *Amadeo*, 82 P.R.R. 98, 103 (1961), to faithfully determine the market value of the real prop-

erty, but to establish such accurate assessment rules and scientific assessment factors as will allow the fixing of adequate and fair valuations for tax purposes. De Pedro, The Scientific Assessment, 13 *Rev. Col. Abo. P.R.* 385 (1950). It is inferred from the statement above that the force of judicial research shall be directed toward inquiring whether or not the official assessment follows this uniformity rule regardless of the existence of any other method which may effectively help to establish the market value, since this is the only way to reach a fair, equitable, and reasonable distribution of the tax burden among all taxpayers. See Assessment and Reassessment of Real Property, published by the Department of the Treasury (1958).

There is no need for elaboration to perceive immediately that the appellate court withdrew from the stated principles and that the Secretary's contentions are correct. As it will be seen, the trial judge chose the method he considered more appropriate and set aside not only the criterion of uniformity, but also the effects of the evidence furnished. This leads us to briefly review the evidence.

The construction of the property known as Professional Building was started about 1948.[1] The total cost, including the equipment therein, amounted to around $1,388,000.[2] The

---

[1] In order to encourage the construction industry, the Legislature approved Act No. 151 of May 11, 1948, 13 L.P.R.A. § 552 *et seq.*, exempting from property taxes, including those levied for the year 1948–49, all buildings under construction on July 1, 1948, or started after that date, including the equipment and machinery acquired to be installed therein. This exemption shall be in force until such time as the tax exempt building is completed or in such condition as will permit the use thereof for the purposes for which it was constructed, but in no case shall the exemption be in force for more than three years.

[2] In the corporation's annual report for the year 1958–59 this building appears as a $1,349,476.40 asset with an accumulated depreciation of $234,844.17, and the machinery and equipment appears with a value of $361,191.38 and an accumulated depreciation of $241,844.17. The difference may be explained by the addition of capitalized improvements to the building and equipment.

initial assessment for 1951–52 was based on estimates since on the assessment date this was a structure of special characteristics, and as such it was not covered in the classification manual. The issuance of schedules, in regard to similar buildings, to reach the desired uniformity was not easy. The Professional Building may be considered a pioneer in this type of buildings. Those who still remember the City of Santurce at that time will corroborate this statement. Nonetheless, the property was assessed at $1,020,000, but due to the taxpayer's negotiations a superdevelopment special depreciation factor—the construction of a building where it is not financially advisable—was considered, resulting in a final tax assessment of $694,000. Since this amount represented 76% of the full assessment, its total value would have been $920,310. It remained so until the 1957 revision.

In general terms the 1957 revision considered market changes, especially those responding to progressive changes in the material order, and fundamentally to the increase in the construction costs, which was determined to be around 25%, to be precise 24.91%, including herein the increase in construction materials and labor. Regarding the latter, it is important to note the enactment of new taxes such as unemployment compensation tax and the Federal Security tax, and that there was an increase in the rates of the State Insurance Fund.

Specifically, in regard to the Professional Building a purely mathematical computation of value was not made because the 1951–52 estimated value was *completely discarded*, since the information necessary to establish a specific classification covering buildings of this type was already available. The superdevelopment factor was also eliminated because, in view of the increasing financial development, its application was not justified. On the assessment date the building was one among many others. Therefore, the assessment was based on the information on construction cost, plus

increase in cost, less ordinary depreciation,[3] that is, the method known as the present production cost. A total assessed value of $1,208,530 was finally obtained, which value was broken down as follows: $90,960 lot; $1,077,290 structure; $40,280 machinery. It should be noted that an increased rate of 90% and not 76% as in 1951, was considered for tax purposes.[4]

The taxpayer's evidence was directed to establish the building's value based on the method of capitalization of rents which, according to the appraiser's testimony, is not the most accurate and creditable method of achieving uniform assessment because it requires an individual investigation of each property and is subject to fluctuating factors in the determination of rents, and this is unsuited for an orderly assessment process.

■ Since the conclusion of the trial court is basically erroneous—the 1951 assessment—and since it ignored the splendid explanation of the officers of the Department of the Treasury, it has to be reversed. Actually, and in view of the structure of the scientific assessment method, the intervention of the courts in the administrative determination is limited to cases in which, due to very special circumstances, the uniformity pattern must be discarded or, when applicable, the evaluation of the different factors leads to a clearly arbitrary or unfair result. *Cf. Basora Defilló v. Secretary of the Treasury*, 88 P.R.R. 1 (1963); *Commonwealth v. Fonalledas*, 84 P.R.R. 552 (1962); *Buscaglia, Treas. v. Tax Court*, 69 P.R.R. 818 (1949). None of these assumptions appears in the case at issue.

---

[3] According to official reports, considering that the next revision would take from seven to ten years, the present market value was readjusted crediting to each building an accelerated depreciation for the years in which a general revision would not be carried out.

[4] Naturally, this increase was compensated by an adjustment in the tax rates of the Commonwealth and the different municipalities.

For the reasons stated, the judgment rendered by the Superior Court, San Juan Part, on May 1, 1963, will be reversed and the complaint dismissed.